IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PRINCE PILGRIM,

                          Plaintiff,                    Civil Action No.
                                                        9:11-CV-1331 (GLS/DEP)

         v.

THOMAS LaVALLEY, *et al.*

                          Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

FOR PLAINTIFF:

PRINCE PILGRIM, *Pro Se*
92-A-8847
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, NY 12788

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN                        JOHN F. MOORE, ESQ.
New York State Attorney General                  Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is an action originally brought by *pro se* plaintiff Prince Pilgrim, a New York State prison inmate, against two named and one unidentified "Doe" defendants employed at the prison facility in which he was confined at the relevant times, pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights. In the claims that remain in the action, plaintiff alleges that (1) defendant John Doe violated plaintiff's First Amendment rights by ordering him to be transferred to a different correctional facility in retaliation for filing a grievance related to the taxation of cigarettes in the prison commissary; and (2) defendant Drown violated plaintiff's Fourteenth Amendment right to due process at a disciplinary hearing relating to plaintiff's refusal to comply with the scheduled transfer.

Currently pending before the court is a motion brought by defendants seeking the entry of summary judgment based on (1) the plaintiff's failure to ascertain the identity of the John Doe defendant, and (2) defendants' contention that the due process claim against defendant Drown lacks merit.[1] For the reasons set forth below, I recommend that defendants'

---

[1]    In their motion defendants also seek dismissal of plaintiff's claims against defendant Thomas LaValley, the superintendent at the Clinton Correctional Facility. As will be seen, LaValley was added as a defendant solely to facilitate plaintiff's efforts to

motion for summary judgment be granted.

I.      <u>BACKGROUND</u>[2]

Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* <u>Dkt. No. 1</u>. While he is now incarcerated elsewhere, at the times relevant to his claims in this action, plaintiff was confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.*

On November 3, 2008, plaintiff read a memorandum, dated April 20, 2007, and issued by Ted Meskunas, an institutional steward at Clinton, advising that inmates at Clinton would be required to pay the New York state excise tax on cigarettes purchased in the prison commissary. <u>Dkt. No. 1 at 8</u>. Later that day, plaintiff submitted a grievance regarding the collection of that excise tax. *Id.* Plaintiff's grievance regarding the cigarette tax was filed with the facility's inmate grievance program ("IGP") on or about

---

ascertain, through discovery, the identity of the Doe defendant. In light of this fact and the lack of any allegations in plaintiff's complaint of wrongdoing on the part of Superintendent LaValley, plaintiff's claims against him will be dismissed.

[2]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

November 12, 2008. *Id.*; *see also* Dkt. No. 62-4 at 2. Following the denial of that grievance at the facility level, plaintiff appealed the matter to the DOCCS Central Office Review Committee ("CORC"); that grievance appeal was received by the CORC on December 17, 2008. Dkt. No. 1 at 9.

On December 18, 2008, plaintiff was informed that he was being transferred from the Clinton-Main, a maximum level security facility, to the Clinton-Annex, a medium facility. Dkt. No. 1 at 9. Plaintiff refused, however, to be transferred to the Clinton-Annex. Dkt. No. 62-5 at 15. As a result, a misbehavior report was issued to the plaintiff on December 18, 2008, accusing him of failing to follow a staff directive on movement and disobeying a direct order, in violation of prison regulations. Dkt. No. 62-5 at 3; *see* Dkt. No. 62-6 at 6. A Tier III disciplinary hearing was convened, beginning on December 26, 2008, by Hearing Officer C. Drown to address the charges set forth in that misbehavior report.[3] *See* Dkt. No. 62-5. At the conclusion of the hearing, plaintiff was found guilty on both counts, and a

---

[3]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

penalty that included five months of disciplinary special housing unit ("SHU") confinement, with a corresponding loss of package and commissary privileges, and a recommended forfeiture of three months of good time credits, was imposed. Dkt. No. 62-5 at 34. *See also* Dkt. No. 62-6 at 2. That determination was affirmed on review by Norman R. Bezio, the DOCCS Director of Special Housing/Inmate Disciplinary Program, on February 24, 2009. Dkt. No. 62-6 at 1.

In his complaint, plaintiff claims that the issuance of the December 18, 2008, misbehavior report was in retaliation for his having filed a grievance concerning the cigarette excise tax issue. *See generally* Dkt. No. 1. Plaintiff also contends that during the course of the disciplinary hearing conducted to address the disciplinary charges, his due process rights were violated when defendant Drown "coerc[ed] one of Plaintiff's witnesses," and "became hostile and difficult in allowing Plaintiff to question his witness" and "had a pre-determined disposition of 3 months already written out" beforehand. Dkt. No. 1 at 11-12.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 10, 2011, by the filing of a complaint and an accompanying application for leave to proceed *in forma*

5

*pauperis* ("IFP").[4] Dkt. Nos. 1, 2. Plaintiff's complaint named, as defendants, Ted Meskunas, an institutional steward at Clinton; John Doe, an unidentified corrections officer who allegedly authorized plaintiff's transfer; and Hearing Officer Curtis Drown. Dkt. No 1 at 1-2. Liberally construed, plaintiff's complaint asserted three distinct constitutional claims, alleging that (1) defendant Meskunas violated plaintiff's rights under the Fifth and Fourteenth Amendments to the U.S. Constitution by collecting taxes without due process; (2) defendant John Doe violated plaintiff's First Amendment rights by ordering a retaliatory transfer and denying his right to free speech; and (3) defendant Drown violated plaintiff's Fourteenth Amendment right to procedural due process at the Tier III disciplinary hearing. Dkt. No. 1 at 12-14; Dkt. No. 8 at 7.

Plaintiff's claim against defendant Meskunas was dismissed in its entirety on February 22, 2012, as a result of the court's initial review of plaintiff's complaint under 28 U.S.C. §§ 1915(e) and 1915A, leaving only the Doe defendant and defendant Drown. Dkt. No. 8 at 8-11. Shortly thereafter, it was discovered that defendant Drown died prior to the commencement of this action, and was therefore never properly made a party or served. Dkt.

---

[4]    Plaintiff's complaint is dated October 28, 2011. *See* Dkt. No. 1 at 14.

No. 13. Drown's estate was substituted in his place as party to this action on July 12, 2013. Dkt. No. 35. A subsequent motion to dismiss the estate as a party was denied. Dkt. Nos. 49, 51.

On November 30, 2012, at a point when plaintiff's claim against defendant Meskunas had been dismissed, and defendant Drown's estate had not yet been served, leaving only John Doe as a defendant, the court added the superintendent at Clinton, Thomas LaValley, as a party "for discovery purposes only in an effort to assist plaintiff in identifying defendant John Doe. Text Order Dated November 30, 2012. It was the court's intention, in issuing that text order, that defendant LaValley would be dismissed from the suit following the close of discovery in light of the absence of any allegations in plaintiff's complaint concerning his personal involvement in the conduct forming the basis for Pilgrim's claims.

On May 4, 2015, defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 62. In their motion, defendants request dismissal of (1) plaintiff's claims against the John Doe defendant, based both upon his failure to identify and serve that defendant and the contention that plaintiff's retaliation cause of action lacks merit; (2) plaintiff's due procedural due process cause of action claim

against defendant Drown's estate, as lacking in merit; and (3) all claims against defendant LaValley, based upon the closure of discovery, and the lack of his involvement in the matter. *Id.*

Since the filing of defendants' motion, plaintiff has requested and has been granted three extensions of time to oppose the motion. Dkt. Nos. 65, 69, and 71. The last extension granted by the court required plaintiff to file a response by November 13, 2015, and warned him that it was the final extension of the deadline. Dkt. No. 71, 73. On January 15, 2016, plaintiff made a partial submission in opposition to the motion, and moved to extend the deadline a fourth time, for an additional period of 120 days. Dkt. No. 72. That motion was denied by the court, and the accompanying partial opposition was stricken from the record.[5]  Dkt. No. 73.

Defendants' motion for summary judgment is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

---

[5]     On February 8, 2016, plaintiff filed a letter requesting leave to withdraw his complaint. Dkt. No. 74. He has not, however, executed a stipulation of discontinuance that was prepared and forwarded to him by defendants' counsel in March 2016 following the announcement of his intention to abandon the action. Dkt. No. 79 at 4-6.

III.    DISCUSSION

A.    Plaintiff's Failure to Oppose Defendants' Motion

As the foregoing reflects, plaintiff has not properly responded in opposition to defendants' motion. By failing to timely oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. The court's local rules provide, in pertinent part, as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

Defendants' motion was properly filed, and defendants, through their motion, have met their burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendants have met their burden, I note that their "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.'" *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *2 (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has met its burden to demonstrate entitlement to a dismissal under local rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[6] Because defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds upon which their motion is based, and plaintiff has failed to respond in opposition to the summary judgment motion and their motion is facially material, I recommend that the court grant defendants' motion on this basis.[7]

---

[6]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[7]     Notwithstanding my recommendation to dismiss plaintiff's complaint based on his failure to oppose the defendants' motion, out of an abundance of caution, I will address the substantive issues raised in defendants' motion. *See Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996) ("[D]istrict courts should be especially hesitant to dismiss for

In the event the court chooses to overlook plaintiff's failure to respond to defendants' motion and does not treat that failure as consent to the granting of the motion, the court should nonetheless invoke the local rule that speaks to his failure to properly respond to defendants' statement of material facts, submitted pursuant to Local Rule 7.1(a)(3). By its terms, that rule provides, in part, that "<u>[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.</u>" N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, J.) (listing cases).

Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Pub. Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL

procedural deficiencies where, as here, the failure is by a pro se litigant.").

278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of not properly responding to defendants' Local Rule 7.1 Statement, and he has failed to do so, I recommend that the court deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See*, *e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.   <u>Summary Judgment Standard</u>

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C.    Retaliation Claim Against Defendant John Doe

#### 1.    Failure to Identify and Serve

Despite the court's assistance, included by naming Superintendent LaValle as a defendant, plaintiff was unable to identify a person defendant who authorized his transfer from Clinton-Main to Clinton-Annex.[8] Defendants now seek dismissal of plaintiff's claims against the Doe defendant based upon his failure to identify and serve that defendant.

---

[8]    Defendants maintain that the transfer order was generated by a "scheduler," independent of human input, and thus there is no individual who ordered the transfer. *See* Dkt. No. 62-8 at 2.

When this action was filed, Rule 4(m) of the Federal Rules of Civil

Procedure authorized dismissal of a plaintiff's claims against a defendant

where a summons and complaint were not served upon that party within

120 days after filing of the complaint, absent a showing of good cause.[9]

Fed. R. Civ. P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL

9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where

no service within 120 days after filing of the complaint); *Romand v.*

*Zimmerman,* 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, C.J.)

(120-day period for service of a summons and complaint by a plaintiff under

Fed. R. Civ. P. 4(m) applies to *pro se* plaintiffs as well as those represented

by counsel). When "Doe" defendants have not been served or otherwise

appeared in the action within this time period, the court does not acquire

jurisdiction over the defendant, and the plaintiff's complaint should be

dismissed as against that defendant. *See, e.g., Michelson v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.,* 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)

(citing *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45

(1946)) (court lacks jurisdiction until defendants properly served with

---

[9]     Effective December 1, 2015, Rule 4(m) was amended to require service of a
summons within ninety days. It should be noted, moreover, that the period specified in
Rule 4(m) is further restricted by the local rules of this court, which require that service be
effected within sixty days. *See* Northern District of New York Local Rule § 4.1(b).

summons and complaint).

Here, plaintiff was permitted to pursue a claim against the unnamed defendant who, he alleges, retaliated against him by ordering his transfer to a different cell, provided that he "take reasonable steps to ascertain the identity of that defendant." Text Order Dated Nov. 30, 2012. That text order warned that "[i]f plaintiff fails to ascertain the identity of defendant John Doe so as to permit the timely service of process, this action will be dismissed in its entirety." *Id.*

Following that text order discovery, which is now closed, took place over a period of roughly two years, ending in December 2014. Dkt. No. 20, Dkt. No. 57. In that time, plaintiff has been unable to identify any individual responsible for the decision to transfer him. *See generally* docket. Dismissal of a claim is appropriate "[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 9:12-CV-0447, 2015 WL 791547 at *21, (N.D.N.Y. Feb. 24, 2015) (quoting *Delrosario v. City of New York*, No. 07 Civ. 2027, 2010 WL 882990 at *5, (S.D.N.Y. Mar. 2010)). Accordingly, the claim against defendant John Doe should be dismissed, and the defendants' motion should be granted, on this basis.

## 2.    Merits of Plaintiff's Retaliation Claim

A prison inmate's First Amendment rights are violated when a prison official takes adverse action against the prisoner, motivated by his exercise of a right protected under the free speech provision of that Amendment.[10] To prove his claim of unlawful retaliation, the plaintiff must establish that (1) he engaged in protected conduct; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action – that is, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 7, 2003) (Sharpe, M.J.).

In the instant case, plaintiff meets the first element of this required showing. It is well-established that the filing of a grievance by a prison

---

[10]    The Second Circuit has cautioned that such claims of retaliation are easily incanted, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

inmate constitutes protected activity. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). The third element arguably is also met as well; the transfer of a prison inmate from one facility to another can, under appropriate circumstances, represent adverse action. *Meriwether v. Coughlin*, 879 F.2d 1037, 1045-45 (2d Cir. 1989) (prison officials may not transfer solely for the exercise of constitutional rights); *see also Johnson v. Connolly*, No. 07-CV-1237, 2010 WL 2628720, *6 (N.D.N.Y. Mar. 15, 2010) (Peebles, M.J.) ("plaintiff's transfer from one facility into another [could] represent an adverse action sufficient to support a retaliation cause of action") (citing *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998).

Plaintiff's retaliation claim fails, however, based upon his inability to establish the requisite causal nexus between his filing of a grievance and his transfer. The record evidence clearly shows that the decision to transfer the plaintiff to the Clinton-Annex was made on October 30, 2008. Dkt. No. 22-3, Dkt. No. 62-5 at 19-20. Plaintiff's grievance regarding the cigarette taxation issue that allegedly caused defendants to retaliate against Pilgrim was filed on November 12, 2008, two weeks after the transfer order was issued. Dkt. No. 1 at 8, Dkt. No. 62-4 at 2. As the allegedly retaliatory event

preceded in time the relevant protected conduct, simple logic compels the conclusion that the transfer decision could not have been motivated by plaintiff's grievance. Accordingly, plaintiff's claim of retaliation must fail.

For both of the reasons stated above, I recommend that defendants' motion be granted as to defendant John Doe.

### D. Plaintiff's Claim Against Defendant LaValley

In their motion, defendants seek dismissal of plaintiff's claims against defendant LaValley. As was previously discussed, defendant LaValley was added as a defendant solely for discovery purposes, in order to permit Pilgrim to attempt to ascertain the identity of the unidentified, John Doe defendant. Dkt. No. 57. Discovery is now closed. Since plaintiff's complaint contains no allegations of wrongdoing on the part of defendant LaValley, nor does it suggest his involvement in any of the conduct giving rise to plaintiff's claims, this portion of defendants' motion should be granted, and plaintiff's claims against defendant LaValley should be dismissed.

### E. Plaintiff's Due Process Claim Against Defendant Drown

In his complaint, plaintiff asserts a due process violation claim against defendant Drown, stemming from defendant Drown's oversight of plaintiff's hearing. Dkt. No. 1 at 12-13. In support of their motion, defendants argue

that plaintiff was provided with constitutionally adequate process during his

disciplinary hearing. [Dkt. No. 62-1 at 6-7](Dkt. No. 62-1 at 6-7).

### 1. Legal Standard Governing Due Process Claims

To establish a procedural due process claim under section 1983, the

plaintiff must show that he (1) possessed an actual liberty interest, and (2)

was deprived of that interest without being afforded sufficient process.[11]

*Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143

F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d

Cir. 1996). The procedural safeguards to which a prison inmate is entitled

before being deprived of a constitutionally significant liberty interest are well

established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). Specifically,

under *Wolff*, the constitutionally mandated due process requirements

include (1) written notice of the charges to the inmate; (2) the opportunity to

appear at a disciplinary hearing and a reasonable opportunity to present

witnesses and evidence in support of his defense, subject to a prison

facility's legitimate safety and penological concerns; (3) a written statement

by the hearing officer explaining his decision and the reasons for the action

---

[11]     Defendants do not argue that the hearing officer's sentence, which included five
months of disciplinary SHU confinement, did not constitute the deprivation of a
cognizable liberty interest.

being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Id.* at 564-69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that an "inmate subject to a disciplinary hearing is entitled to . . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996)). "A hearing officer may satisfy the standard of impartiality if there is 'some

evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

### 2. Analysis

The record now before the court demonstrates that in carrying out his responsibilities, Hearing Officer Drown satisfied the procedural due process requirements laid out in *Wolff*. Plaintiff received a misbehavior report and a written notice of the charges against him. Dkt. Nos. 1 at 8, 62-10 at 5-6. Defendant Drown began the Tier III disciplinary hearing by reciting the charges against the plaintiff. Dkt. No. 62-5 at 3. Plaintiff was provided an opportunity to speak in his own defense. *Id.* at 3-33. In addition, he was allowed to, and in fact did, call witnesses to testify in his defense, including the Superintendent of Clinton, Dale Artus. *Id.* at 29-33. At the conclusion of the hearing, defendant Drown presented plaintiff with a written copy of his disposition. *Id.* at 34-35. The record of the Tier III hearing contains no evidence from which a reasonable factfinder could conclude defendant Drown was biased or otherwise unfair. Simply stated, I am unable to conclude that plaintiff was not afforded the required due process during the course of the hearing conducted by defendant Drown.

Included in the record is a transcript of the Tier III hearing as well as the hearing officer's determination. *See* Dkt. Nos. 62-5, 62-6. From a careful review of the hearing transcript I conclude that the decision of defendant Drown, finding plaintiff guilty on both counts, is supported by some evidence, as constitutionally required. Plaintiff admitted that he refused the orders which he was charged with disobeying. Dkt. No. 62-5 at 6, 15. Testimony from Superintendent Artus refuted plaintiff's contention that he would be justified in refusing the order based on his position on the facility's Inmate Liaison Committee. *Id.* at 30. Because the decision by defendant Drown is supported by some evidence in the record, the hearing passes muster under the standard of impartiality required by the Supreme Court in *Hill.* 472 U.S. at 455.

In sum, I find that no reasonable factfinder could conclude that plaintiff was denied due process by defendant Drown. Accordingly, summary judgment should be entered dismissing this remaining claim.

## IV.     SUMMARY AND RECOMMENDATION

Plaintiff's claims against defendant LaValley, the facility superintendent who was added as a defendant solely to assist plaintiff in his efforts to secure pretrial discovery and ascertain the identity of the John Doe

defendant, should be dismissed now that discovery is closed and based upon the lack of any allegation of plaintiff's complaint suggesting his personal involvement in any of the conduct giving rise to plaintiff's claims.

Turning to remaining portions of defendants' motion, I conclude, first that because defendants have established their entitlement to the relief sought, their motion should be granted based upon plaintiff's failure to properly oppose the motion. In the event the court chooses to address the substantive arguments raised by the defendants, I recommend a finding that because no reasonable factfinder could conclude that John Doe retaliated against the defendant, or that Hearing Officer Drown deprived him of procedural due process, defendants are entitled to the entry of summary judgment dismissing plaintiff's remaining claims.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 62) be GRANTED in its entirety; and it is further hereby respectfully

RECOMMENDED that plaintiff's letter motion requesting leave to withdraw his complaint in this action (Dkt. No. 74) be DENIED, as moot.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     March 30, 2016
             Syracuse, New York

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jose RODRIGUEZ, Plaintiff,
v.
Glen S. GOORD, et al, Defendants.
No. 9:04-CV-0358 (FJS/GHL).

Nov. 27, 2007.
Jose Rodriguez, Willard, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, David L. Cochran, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

FREDERICK J. SCULLIN, Senior District Judge.

**\*1** The above-captioned matter having been presented
to me by the Report-Recommendation of Magistrate Judge
George H. Lowe filed November 6, 2007, and the Court
having reviewed the Report-Recommendation and the
entire file in this matter, and no objections to said
Report-Recommendation having been filed, the Court
hereby

**ORDERS,** that Magistrate Judge Lowe's November
6, 2007 Report-Recommendation is **ACCEPTED** in its
entirety for the reasons stated therein; and the Court
further

**ORDERS,** that Defendants' motion, pursuant to Local
Rule 41.2(b), to dismiss for Plaintiff's failure to provide
notice to the Court of a change of address, is **GRANTED;**
and the Court further

**ORDERS,** that the Clerk of the Court enter judgment
in favor of the Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant
to 42 U.S.C. § 1983, has been referred to me for Report
and Recommendation by the Honorable Frederick J.
Scullin, Jr., Senior United States District Judge, pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local
Rules of Practice for this Court. Generally, Jose Rodriguez
("Plaintiff") alleges that, while he was an inmate at Oneida
Correctional Facility in 2003 and 2004, ten employees of
the New York State Department of Correctional Services
("Defendants") were deliberately indifferent to his serious
medical needs, and subjected him to cruel and unusual
prison conditions, in violation of the Eighth Amendment.
(Dkt. No. 27 [Plf.'s Am. Compl.].) Currently pending is
Defendants' motion to dismiss for failure to provide notice
to the Court of a change of address, pursuant to Local
Rule 41.2(b) of the Local Rules of Practice for this Court.
(Dkt. No. 86.) Plaintiff has not opposed the motion,
despite having been given more than six weeks in which
to do so. Under the circumstances, I recommend that (1)
Defendants' motion to dismiss be granted, and (2) in the
alternative, the Court exercise its inherent authority to *sua
sponte* dismiss Plaintiff's Amended Complaint for failure
to prosecute and/or failure to comply with an Order of the
Court.

## I. DEFENDANTS' MOTION TO DISMISS

Under the Local Rules of Practice for this Court,
Plaintiff has effectively "consented" to the granting of
Defendants' motion to dismiss, since (1) he failed to
oppose the motion, (2) the motion was properly filed, and
(3) Defendants have, through the motion, met their burden
of demonstrating entitlement to the relief requested in the
motion. L.R. 7.1(b)(3).

In particular, with regard to this last factor (i.e., that
Defendants have met their burden of demonstrating
entitlement to the relief requested), Defendants argue that
their motion to dismiss should be granted because (1)
Local Rule 41.2(b) provides that "[f]ailure to notify the
Court of a change of address in accordance with [Local
Rule] 10.1(b) may result in the dismissal of any pending

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

action," (2) on April 15, 2004, Plaintiff was specifically advised of this rule when (through Dkt. No. 5, at 4) the Court advised Plaintiff that "his failure to [promptly notify the Clerk's Office and all parties or their counsel of any change in his address] will result in the dismissal of his action," (3) on May 22, 2007, Plaintiff was released from the Willard Drug Treatment Center, (4) since that time, Plaintiff has failed to provide notice to the Court (or Defendants) of his new address, as required by Local Rule 10.1(b)(2), and (5) as a result of this failure, Defendants have been prejudiced in that they have been unable to contact Plaintiff in connection with this litigation (e.g., in order to depose him, as authorized by the Court on May 4, 2007). (Dkt. No. 86, Part 4, at 1-2 [Defs.' Mem. of Law].)

**\*2** Authority exists suggesting that an inquiry into the third factor (i.e., whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] ) is a more limited endeavor than a review of a contested motion to dismiss.[FN1] Specifically, under such an analysis, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious." [FN2] Given that Defendants accurately cite the law and facts in their memorandum of law, I find that they have met their lightened burden on their unopposed motion. Moreover, I am confident that I would reach the same conclusion even if their motion were contested.

> FN1. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at \*7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at \*2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1

[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at \*2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at \*3 (N.D.N.Y. Aug. 27, 1996) (Hurd, J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

> FN2. *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625 at \*8.

For these reasons, I recommend that the Court grant Defendants' motion to dismiss.

## II. *SUA SPONTE* DISMISSAL

Even if Defendants have not met their burden on their motion to dismiss, the Court possesses the inherent authority to dismiss Plaintiff's Amended Complaint *sua sponte* under the circumstances. Rule 41 of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a proceeding for (1) failure to prosecute the action and/or (2) failure to comply with the Federal Rules of Civil Procedure or an Order of the Court. Fed.R.Civ.P. 41(b).[FN3] However, it has long been recognized that, despite Rule 41 (which speaks only of a *motion* to dismiss on the referenced grounds, and not a *sua sponte* order of dismissal on those grounds), courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) not only recognizes this authority but *requires* that it be exercised in appropriate circumstances. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

> FN3. Fed.R.Civ.P. 41(b) (providing, in pertinent part, that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

order of court, a defendant may move for dismissal of an action or of any claim against the defendant").

**A. Failure to Prosecute**

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN4] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute:

> FN4. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN5]

> FN5. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted].

**\*3** As a general rule, no single one of these five factors is dispositive.[FN6] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN7]

> FN6. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

> FN7. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal. The duration of Plaintiff's failure is some six-and-a-half months, i.e., since April 22, 2007, the date of the last document that Plaintiff attempted to file with the Court (Dkt. No. 85). Plaintiff received adequate notice (e.g., through the Court's above-referenced Order of April 15, 2004, and Defendants' motion to dismiss) that his failure to litigate this action (e.g., through providing a current address) would result in dismissal. Defendants are likely to be prejudiced by further delays in this proceeding, since they have been waiting to take Plaintiff's deposition since May 4, 2007. (Dkt. No. 84.) I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action.[FN8] Finally, I have considered all less-drastic sanctions and rejected them, largely because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff may very well not reach him, due to his failure to provide a current address).

> FN8. It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against Defendant.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

**B. Failure to Comply with Order of Court**

With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal ... for failure to comply with an order of the court is a matter committed to the discretion of the district court." [FN9] The correctness of a dismissal for failure to comply with an order of the court is determined in light of five factors:

FN9. *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.[FN10]

FN10. *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal for the same reasons as described above in Part II.A. of this Report-Recommendation. I note that the Order that Plaintiff has violated is the Court's Order of April 15, 2004, wherein the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 5, at 4.) Specifically, the Court advised plaintiff that *"[p]laintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do same will result in the dismissal of this action."* (*Id.*) I note also that, on numerous previous occasions in this action, Plaintiff violated this Order, resulting in delays in the action. (*See* Dkt. Nos. 47, 48, 49, 50, 54, 59, 72, 78, 79 & Dkt. Entry for 12/15/06 [indicating that mail from the Court to Plaintiff was returned as undeliverable.])

**\*4** As a result, I recommend that, should the Court decide to deny Defendants' motion to dismiss, the Court exercise its authority to dismiss Plaintiff's Amended Complaint *sua sponte* for failure to prosecute and/or failure to comply with an Order of the Court.

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 86) be ***GRANTED%;*** and it is further

**RECOMMENDED** that, in the alternative, the Court exercise its inherent authority to *SUA SPONTE DISMISS* Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)..

N.D.N.Y.,2007.

Rodriguez v. Goord
Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

[FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See*Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See*Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See*Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrell v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

## II. Retaliation

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

### INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
\*2–3 (N.D.N.Y.), *af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at \*1 (S.D.N.Y.1995) (when a party makes no objection
to a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> FN1. Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

  Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008)* ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

### CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
No. 96 Civ. 3635(JGK).

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

   **\*1** The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is

clear that he has never properly served any of the defendants.

I.

   Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. *See* Fed.R.Civ.P. 4(m); *see also Gowan v. Teamsters Union (237),* 170 F.R.D. 356, 359-60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

   Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. *See* Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. *See* Fed.R.Civ.P. 4(e)(1).

   Under New York law, a state officer sued in an official capacity or a state agency must be served by:

   (1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, see N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. See N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. See N.Y. C.P.L.R. 308(2) & (4).

II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (*See* Letter from Michael Kennedy dated Feb.

13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (*See* Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (*See* Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

(A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (*See* Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (*See* Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ., 921 F.Supp. 963, 968 (S.D.N.Y.1996); Dawkins v. Hudacs, 159 F.R.D. 9, 10 (N.D.N.Y.1994); Town of Clarkstown v. Howe, 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); Sannella v. Regan, 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985).* Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co., 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); Gibbs v. Hawaiian Eugenia Corp., 581 F.Supp. 1269, 1271 (S.D.N.Y.1984).* The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States, 834 F.Supp. 99, 102 (S.D.N.Y.1993); Olympus Corp. v. Dealer Sales and Serv., Inc., 107 F.R.D. 300, 305 (S.D.N.Y.1985),* there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at *1 (S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

(Cite as: 1999 WL 9847 (S.D.N.Y.))

defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

(1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

**\*5** *Gordon v. Hunt,* 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. *See Gowan,* 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

### III.

The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. *See Shuster v. Nassau County,* 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of

one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

### IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

### V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

### CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

S.D.N.Y.,1999.

Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 791547
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eugene JONES, Plaintiff,

v.

ROCK, Superintendent, Upstate Correctional
Facility; J. Marienelli, MHU Counselor, Upstate
Correctional Facility; John Doe # 3, Mental Health
Doctor, Upstate Correctional Facility; Michael
Hogan, Mental Health Commissioner; J. Healy,
Co., Upstate Correctional Facility; John Doe #
2, Co., Upstate Correctional Facility; John Doe
# 3, Co., Upstate Correctional Facility; Laveen,
C .O., Upstate Correctional Facility; Dwyer, C.O.,
Upstate Correctional Facility; John Doe # 4,
Lt., Upstate Correctional Facility; S. Santamore,
Sgt., Upstate Correctional Facility; Burgess, Co.,
Upstate Correctional Facility; John Doe # 5, Co.,
Upstate Correctional Facility; John Doe # 6, CO.,
Upstate Correctional Facility; Jerry Miller, Dental
Doctor, Upstate Correctional Facility, Defendants.

No. 9:12–cv–0447 (NAM/TWD).
|
Signed Feb. 24, 2015.

**Attorneys and Law Firms**

Eugene Jones, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Colleen Galligan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 31st day of January 2015. Following
fourteen (14) days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by the
parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt. No.
46) is granted in its entirety.

3. The plaintiff's claims against John Doe defendants # 1–
6 are dismissed without prejudice from this action due to
plaintiffs failure to prosecute.

4. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### ORDER AND REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

### I. INTRODUCTION

Plaintiff Eugene Jones commenced this *pro se* civil rights
action under 42 U.S.C. § 1983 for the violation of his
Eighth Amendment right to be free from cruel and unusual
punishment while he was confined in the Upstate Correctional
Facility ("Upstate"). (Dkt. No. 1.) Plaintiff asserted claims
in his Complaint for: (1) deliberate indifference to his
serious mental health needs against Defendants Upstate
Superintendent Rock ("Rock"), Upstate Mental Health Unit
("MHU") Psychologist 2, J. Marinelli, incorrectly sued
as Marienelli ("Marinelli"), MHU Unit Chief T. Kemp
("Kemp"), Mental Health Doctor John Doe # 1, and
Mental Health Commissioner Michael Hogan ("Hogan"),
*id.* at ¶ 72; (2) excessive force and deliberate indifference
to Plaintiff's serious mental health and medical needs
against Defendants Corrections Officer Healy ("Healy"), and
Corrections Officers John Doe # 2 and John Doe # 3, *id.*
at ¶ 73; (3) conditions of confinement against Defendant
Rock; *id.* at ¶ 74; (4) sexual harassment, assault, and
excessive force against Defendants Lt. John Doe # 4, Sgt.
S. Santamore ("Santamore"), Corrections Officer Lavigne,
incorrectly sued as Laveen ("Lavigne"), and Corrections

Officer Dyer, incorrectly sued as Dwyer ("Dyer"), *id.* at ¶ 75; and (5) deliberate indifference to Plaintiff's serious dental needs against Defendants Corrections Officer John Doe # 6, Doctor Jerry Miller ("Dr. Miller" or "Miller").

Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure after filing an Answer to the Complaint. (Dkt. No. 23.) Plaintiff opposed the motion. (Dkt. No. 27.) The Hon. Norman A. Mordue, Senior D.J., adopting the Report and Recommendation of this Court (Dkt. No. 30), granted Defendants motion in part and denied it in part. (Dkt. No. 31.) Dismissed on the motion were: (1) all of Plaintiffs claims seeking money damages against all Defendants in their official capacity with prejudice on Eleventh Amendment grounds; (2) claim for deliberate indifference to Plaintiff's serious mental health needs as against Defendant Hogan only; (3) claim for conditions of confinement against Defendant Rock; (4) claims for sexual harassment, assault and excessive force against Defendants Lavigne, Dyer, and Santamore; and (5) claim for deliberate indifference to Plaintiff's serious dental needs as against Defendants Burgess and Santamore. [1]

**\*2** Defendants Marinelli, Kemp, Healy, Dyer, and Miller have now moved for summary judgment on Plaintiff's remaining Eighth Amendment claims: (1) Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marinelli and Kemp; (2) Count # 2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and excessive force against Defendant Healy; and (3) Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dyer. (Dkt.Nos.46, 46–2.)

The grounds for summary judgment asserted by Defendants are: (1) Plaintiff's failure to exhaust administrative remedies as to Counts # 1 and # 2 against Marinelli, Kemp, and Healy; (2) Plaintiff's inability to state a prima facie claim of deliberate indifference with regard to medical (mental health) care against Defendants Kemp or Marinelli and medical (dental) care against Defendants Miller and Dyer; (3) Defendants Kemp and Miller's lack of personal involvement in the alleged violation of Plaintiffs Eighth Amendment rights; and (4) Defendants Kemp, Marinelli, Dyer, and Miller's right to qualified immunity. (Dkt. No. 46–2 at 2–3.) [2]

Plaintiff has not opposed Defendants' summary judgment motion. For the reasons that follow, the Court recommends that Defendants' motion (Dkt. No. 46) be **GRANTED** in its entirety and further recommends the *sua sponte* dismissal of the action against Defendants John Does # 1–6 for failure to prosecute.

## II. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Ruotolo v. IRS,* 28 F.3d 6, 8 (2d Cir.1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the ... motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP) JCF, 1999 WL 983876 at \*3, U.S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999) [3] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." [4] *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.' ") (quoting *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001)).

Recently, in *Jackson v. Federal Exp.,* 766 F.3d 189, 198 (2d Cir.2014), the Second Circuit made clear that "[i]n the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted). [5]

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). [6] For this reason, courts in this district have routinely enforced L.R. 7.1(a)(3) [7] in cases in which the non-movant has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts to have been admitted where: (1) the facts are supported by evidence in the record; [8] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion. [9] *See Champion,* 76 F.3d at 486; *see also Jackson,* 766 F.3d at 194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted.") While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants ... does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Literati v. Gravelle,* No. 9:12–CV–00795 (MAD/DEP), 2013 WL 5372872, at \*6, 2013 U.S. Dist. LEXIS 137826, at \*8 (N.D.N.Y. Sept.24, 2013) (internal citations and punctuation omitted).

**\*4** In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiffs verified Complaint, are accepted as true. *See McAllister v. Call,* No. 9:10–CV–610, 2014 WL 5475293 (FJS/CFH), at \*3, 2014 U.S. Dist. LEXIS 154422, at \*3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara,* No. 9:11–CV–1353 (GTS/RFT), 2013 WL 5437617, at \*3, 2013 U.S. Dist. LEXIS 14125, at \* 6 (N.D.N.Y. Sept.27, 2013) ("Because Plaintiff[, who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a) (3) ..., supplemented by Plaintiff's verified Complaint ..., as true."). As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Literati,* 2013 WL 5372872, at \*7 (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003)).

### III. BACKGROUND

#### A. Plaintiff's Mental Health Issues

Plaintiff has been incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") since the fall of 1995. (Dkt. No. 46–1 at ¶ 1; 47 at ¶ 6.) [10] Because Plaintiff had received psychiatric services while in the Niagara County Jail, he was seen by a psychiatrist when he entered the DOCCS system and placed on the New York State Office of Mental Hygiene ("OMH") service. (Dkt. Nos. 46–1 at ¶ 2; 47 at ¶ 7; 47–1 at 13.) He has received mental health services from OMH off and on since his incarceration. (Dkt. Nos. 46–1 at ¶ 3; 47 at ¶ 8; 47–1 at 12–21.)

During his incarceration, Plaintiff's "Mental Health Level" has fluctuated from Level 1 to Level 6 on a scale of 1 to 6. (Dkt. Nos. 46–1 at ¶ 4; 47 at ¶ 9.) The Treatment Needs Service Level UCR Policy defines Level 1 as the most serious and includes major mental illnesses such as schizophrenia and psychotic disorders requiring active treatment, and not having six months of psychiatric stability; those with documented psychotic or bipolar illness who are on certain drugs; and those with psychiatric hospitalizations within the past three years, significant or repeated suicide attempts and/or self-abuse history within the past three years, or suicide attempts resulting in in-patient hospitalization within the last six months. (Dkt. Nos. 46–1 at ¶ 5; 47 at ¶ 10; 47–1 at 9.)

Level 6 is defined as "Mental health assessment completed does not require mental health services." (Dkt. Nos. 46–1 at ¶ 6; 47–1 at 9.) Although Plaintiff's mental health status improved between 2005 and 2010, in August of 2009, while he was in the Special Housing Unit ("SHU") at Great Meadow Correctional Facility ("Great Meadow"), his mental health level was downgraded to Level 3, defined as "Needs/may need short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffer from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Dkt. Nos. 46–1 at ¶ 8; 47–1 at ¶¶ 12–13; 47–1 at 1, 10.) While Plaintiff was confined at Great Meadow, Psychiatrist Kalyana Battau prescribed Topamax for his psychiatric symptoms. (Dkt. Nos. 46–1 at ¶ 9; 47 at ¶ 14; 47–1 at 63.)

**\*5** Plaintiff was transferred from Great Meadow to Upstate on September 17, 2009, and arrived with a diagnosis of Antisocial Personality Disorder ("ASPD"), and a prescription for Topamax. (Dkt. Nos. 46–1 at ¶ 11; 47 at ¶¶ 15–16; 47–1 at 8, 9, 44.) The Transfer Progress Notes prepared by a Great Meadow's Social Worker state that Plaintiffs mental status was "Alert, oriented. No evidence of thought disorder. Mood generally neutral, stable." (Dkt. Nos. 46–1 at ¶ 11; 47–1 at 44.)

According to Plaintiff, Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in SHU. (Dkt. No. 1 at ¶ 14.) Plaintiff was confined in SHU in a single cell in A–Block in 11–Building where mentally ill inmates were housed together. *Id.* at ¶¶ 15, 26. Defendant Marinelli, employed by OMH as a Psychologist 2 at the Central New York Psychiatric Center ("CNYPC") satellite unit at Upstate, first saw Plaintiff on September 21, 2009.

(Dkt. Nos. 1 at ¶ 15; 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) Plaintiff has alleged in his Complaint that he told Marinelli he had a long history of mental illness and treatment both before and during his incarceration. (Dkt. No. 1 at ¶ 16.) Marinelli observed no concerns or issues at that time. (Dkt. No. 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) He placed Plaintiff on "active status" so he would continue to receive OMH services. (Dkt. No. 48–1 at 46–47.)

On September 23, 2009, Marinelli prepared a Mental Health Treatment Plan ("Plan") for Plaintiff based upon his mental health history, diagnosis of ASPD, and current mental status. (Dkt. Nos. 46–1 at ¶ 13; 48 at ¶ 9; 48–1 at 23–34.) The Plan included Plaintiff being placed on Marinelli's service so that he would be seen regularly at his cell, monthly call-outs for private mental health interviews, and continuation of his prescribed medication Topamax. *Id.* The Plan was approved by OMH Staff Psychiatrist Bezalel Wurzberger ("Dr.Wurzberger") on October 2, 2009. (Dkt. Nos. 46–1 at ¶; 48 at ¶ 12.)

When Marinelli saw Plaintiff for a cell-side visit on September 29, 2009, Plaintiff was doing well and had no current health concerns. (Dkt. Nos. 46–1 at ¶ 14; 48, at ¶ 11; 48–1 at 48.) When he met with Plaintiff for a private therapy session on October 7, 2009, Marinelli observed no active mental illness and Plaintiff had no health complaints. (Dkt. Nos. 46–1 at ¶ 15; 48 at ¶¶ 11; 48–1 at 49.)

Plaintiff saw Dr. Wurzberger for an evaluation on October 9, 2009. (Dkt. Nos. 1 at ¶ 17; 23 at ¶ 14; 46–1 at ¶ 18; 47–1 at 30.) Wurzberger's Psychiatric Progress Note states in part:

**COMPLAINTS/CURRENT ISSUES:**

Inmate recently transferred to this facility; gives a history of "ups and downs and anxiety"; says that he was treated with multiple medications in the past; reports "doing alright now", rates himself "in the middle" on the 0–10 moods scale; sleep and appetite are adequate; has no complaints.

**\*6** The record indicates an extensive history of behavioral problems, characterologically driven, for which he was referred twice to the [Behavioral Health Unit] BHU.

**MENTAL STATUS EXAMINATION AND CHANGES:**

Is alert, oriented, coherent and relevant; mood and affect are appropriate; there are no signs of abnormal

psychomotor activity; denies hallucinations; denies self harm thoughts or intent; cognitive functions adequate.

**SUICIDE RISK ASSESSMENT:**

No current warning signs of suicidality.

**PLAN:**

Discussed treatment options, including risks and benefits involved; he is psychiatrically stable, with no objective evidence of a mood disorder or a thought disorder; discussed with him the fact that Topamax has no psychiatric indications, is non-formulary, and is not indicated for his clinical presentation; I suggested a trial of an SSRI for the anxiety symptoms he described; he told me "thank you, but no thank you", and refused to consider other alternatives; we'll monitor for changes and reassess treatment options as needed.

(Dkt. Nos. 46–1 at ¶ 18; 47–1 at 30.) Dr. Wurzberger discontinued Plaintiffs Topamax on October 9, 2009. (Dkt. Nos. 46–1 at ¶ 19; 48 at ¶ 15.) Marinelli and Kemp did not make the decision to discontinue the Topamax. (Dkt. Nos. 46–1 at ¶¶ 43–44; 47 at ¶ 40; 48 at ¶ 48; 48–1 at 64.) According to Kemp, the discontinuance was proper because there is no psychiatric indication for the use of Topamax. (Dkt. Nos. 46–1 at 46; 47 at ¶ 50; 48–1 at 30.)

When Marinelli saw Plaintiff for his weekly cell-side visits on October 13, 2009, October 23, 2009, and November 9, 2009, after discontinuation of the Topamax, Plaintiff denied mental health issues or concerns, and Marinelli observed no evidence of mental illness or ongoing mental health issues or concerns. (Dkt. Nos. 46–1 at ¶¶ 20–22; 48 at ¶¶ 16–18; 48–1 at 50–53.) At a private therapy session with Marinelli on November 13, 2009, Plaintiff discussed efforts to make positive changes in his life, his relationship with his family, and how his early experiences affected how he related to authority figures. (Dkt. Nos. 46–1 at ¶ 23; 48 at ¶ 19; 48–1 at 50.)

The reports from Marinelli's cell-side visits with Plaintiff on November 25, 2009, and December 16 and 31, 2009, and his private mental health interview with Plaintiff on December 15, 2009, all reflect Marinelli's observation that Plaintiff had no current mental health issues. (Dkt. Nos. 46–1 at ¶¶ 24–26; 48 at ¶¶ 20–23; 48–1 at 53–55.) On November 25, 2009, Plaintiff reported he was happy that he had been moved to the PIMS [11] gallery, which was a quieter gallery, and on December 31, 2009, reported that he liked his new

"hood." (Dkt. Nos. 46–1 at ¶ 24; 48 at ¶¶ 20 and 23 .) Plaintiff had also told Marinelli he liked his current housing situation at a private mental health interview on December 15, 2009. (Dkt. Nos. 46–1 at ¶ 25; 48 at ¶ 29; 48–1 at 53.)

**\*7** However, in a January 13, 2010, letter to Defendant Kemp, a Licensed Clinical Social Worker employed by the NYS OMH as Unit Chief for the CNYPC mental health unit at Upstate, Plaintiff complained of being taken off the medication he was on when he arrived at Upstate, and that despite really trying, he was having a lot of symptoms of mental illness and couldn't keep living like that. Plaintiff claimed that he tried to talk to Marinelli, "but he thinks it's a game or something." Plaintiff asked Kemp to change his therapist to someone who would treat his mental health issues rather than treating them like a joke. (Dkt. Nos. 1 at ¶ 20; 27–1 at 10.) Plaintiff claims to have received no reply from Kemp, and Defendants have not referenced the letter in their statement of material facts. (Dkt. Nos. 1 at ¶ 20; 46.) According to Plaintiff, every time he wrote to Kemp, Marinelli would appear at his cell door and warn him against writing the complaints and telling him "not to go over his head." (Dkt. No. 1 at ¶ 20.)

On January 25, 2010, Plaintiff refused to attend his private interview with Marinelli, and Marinelli noted that termination of Plaintiff's mental health services should be considered based upon his stability and lack of reported or observed mental health concerns. (Dkt. Nos. 46–1 at ¶ 28; 48 at ¶ 24; 48–1 at 55.) Marinelli thereafter had a cell-side meeting with Plaintiff on January 29, 2010, and noted that no mental health concerns were reported or observed. (Dkt. Nos. 46–1 at ¶ 29; 48 at ¶ 25; 48–1 at 56.) Marinelli and Plaintiff discussed whether mental health treatment should be discontinued, and according to Marinelli, Plaintiff wanted to wait a month before discontinuing services. *Id.* Marinelli had cell-side visits with Plaintiff on February 18, 2010, February 25, 2010, March 16, 2010, and March 30, 2010. (Dkt. Nos. 46–1 at ¶¶ 31–34; 48 at ¶¶ 27–30; 48–1 at 58–61.) According to Marinelli, Plaintiff denied any mental health issues, and Marinelli did not observe any mental health concerns. *Id.*

On March 30, 2010, Marinelli prepared Termination Transfer Notes recommending that Plaintiff be terminated from OMH service and a Treatment Needs/Service Level Designation recommending that Plaintiff's Mental Health Level be changed to Level 6. (Dkt. Nos. 46–1 at ¶¶ 35–36; 48 at ¶¶ 31–32; 48–1 at 11, 62.) Kemp reviewed the recommendation and Plaintiff's mental health records and approved the change

in Mental Health Level and Plaintiff's removal from OMH services. (Dkt. Nos. 46–1 at ¶ 37; 47 at ¶ 42; 47–1 at 11.) Even after Plaintiff's termination from the OMH caseload, he continued to receive regular mental health evaluations by OMH staff every ninety days due to his SHU placement. (Dkt. Nos. 46–1 at ¶42; 48 at ¶ 39; 48–1 at 3–6.)

On March 22, 2010, prior to the termination, Plaintiff had written to Kemp, identifying the subject of the letter as "I want to know why you are trying to ruin my life worse than it already is." (Dkt. Nos. 1 at ¶ 22; 27–1 at 9.) In the letter, Plaintiff asked why every time he wrote to Kemp complaining about Marinelli, Marinelli would show up bragging that Kemp had given him a copy of the letter. (Dkt. No. 27–1 at 9.) He asked Kemp why he couldn't help him to see a doctor so he could get some medication to stop the voices in his head and told him that when he talked to Marinelli about seeing a doctor, he laughed in his face. *Id.* Again, according to Plaintiff, he received no reply or visit from Kemp regarding the letter. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

 **\*8** On May 3, 2010, Plaintiff wrote to NYS Commissioner of Mental Health Michael Hogan ("Commissioner Hogan" or "Hogan") explaining that the only reason he was bothering him was that Kemp either wouldn't reply to his letters or would keep sending Marinelli to his cell to harass him about writing to Kemp. (Dkt. Nos. 1 at ¶ 21; 27–1 at 8.) Plaintiff explained to Hogan that he had a long history of mental health problems and taking medication. Plaintiff told Hogan that his medication had been taken away, and he felt himself slipping back into mental illness. Plaintiff also complained of hearing people talking and not knowing if the voices were real or in his head. (Dkt. No. 27–1 at 8.) Hogan did not reply. (Dkt. No. 1 at ¶ 21.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Marinelli conducted a SHU 90–day mental health examination of Plaintiff on June 3, 2010, which confirmed that his Mental Health Level was 6, and that he did not require mental health services at that time. (Dkt. Nos. 46–1 at ¶ 38; 48 at ¶ 34; 48–1 at 3–4.) On June 17, 2010, Plaintiff wrote a second letter to Kemp informing Kemp that he had written to his boss about the conditions in SHU and the fact that Kemp and Marinelli had refused to treat mentally ill inmates or let them see mental health doctors. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) The letter is not addressed in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff claims that on August 30, 2010, he used a piece of metal to cut his arms, and when Plaintiff showed Marinelli, he said "they don't look that bad," and told Plaintiff to run some water on the cuts and he would be fine. (Dkt. No. 1 at ¶ 22.) Plaintiff claims that he started screaming and Marinelli just walked away. *Id.* Plaintiff wrote to Kemp the same day. In the letter, Plaintiff told Kemp that he had attempted suicide by cutting his arms open, and Marinelli laughed when he showed him. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Plaintiff asked Kemp to arrange for him to talk to someone other than Marinelli and informed Kemp that the next time he tried suicide, he would not just cut himself but would hang himself and make no mistakes. *Id.* Kemp did not respond. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46.) Marinelli denies the incident occurred and claims that if it had, he would not have responded in the manner Plaintiff has alleged. (Dkt. Nos. 46–1 at ¶ 36; 48 at ¶ 36.) Plaintiff's mental health records, which have been submitted by Defendants, include no reference to the suicide attempt Plaintiff claims to have made. (*See* Dkt. Nos. 47–1 and 48–1.)

On September 10, 2010, Marinelli conducted another SHU 90–day mental health evaluation of Plaintiff, which confirmed that Plaintiff's Mental Health Level remained at Level 6 and did not require any mental health treatment at that time. (Dkt. Nos. 46–1 at ¶ 39; 48 at ¶ 35; 47–1 at 5–6.) On September 21, 2010, Plaintiff wrote a second letter to Hogan. (Dkt. Nos. 1 at ¶21; 27–1 at 7.) In the letter, Plaintiff asked Hogan to come visit Upstate to see what was going on and to help him. According to Plaintiff, the inmates on the mental health caseload were off their medications and were screaming, banging, and throwing things. Plaintiff claimed to be unable to sleep, or eat, and told Hogan that when the mental health staff came around, including Marinelli, they just laughed at everyone and didn't try to talk or do anything about the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

 **\*9** Plaintiff wrote to Kemp again on October 14, 2010. (Dkt. Nos. 1 at ¶ 20; 27–1 at 12.) In the letter, Plaintiff told Kemp that he had been reading and found out that Kemp and his friends had been violating the law by not treating people for their mental illnesses, and that he planned to sue him. Plaintiff wrote that he could not understand how people could look at a person like him as the scum of the earth but see Kemp as a good guy that he would never treat people the way Kemp

did. (Dkt. No. 27–1 at 12.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

On November 8, 2010, Plaintiff sent a formal complaint against Marinelli to Hogan "as outlined in NYCRR § 701.2(A), (C), (E)," and requested that Hogan follow the regular procedure of the Grievance Committee. (Dkt. Nos. 1 at ¶ 21; 27–1 at 5.) In the letter, Plaintiff referenced his previous complaints to Hogan of May 3 and September 21, 2010, and Hogan's failure to take action. (Dkt. No. 27–1 at 5.) The gist of Plaintiff's complaint against Marinelli was that Plaintiff disclosed his long history of mental illness and that the parole board had informed him he needed to take a mental health unit program before he could be released. *Id.* Marinelli said he had reviewed Plaintiffs file and would help him. *Id.* Instead, Plaintiff was taken off his medication and received no treatment at all. *Id.* Plaintiff described the single cell SHU section where he was housed as being filled with mentally ill inmates who were not being treated by the mental health staff and were banging and screaming all night, cutting themselves, smearing feces, and refusing to eat. *Id.* Plaintiff informed Hogan of the letters he had sent to Kemp with no response, and that Marinelli had done nothing to improve the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) The formal complaint is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff was transferred from Upstate to Clinton Correctional Facility on November 15, 2010. (Dkt. Nos. 46–1 at ¶ 40; 48 at ¶ 37.) At that time, Plaintiff's Mental Health Level was still 6, and he did not require any mental health services. *Id.;* Dkt. No. 48–1 at 1.

## B. Healy [12]

According to Plaintiff, in the early morning of October 21, 2010, he made a rope from his sheets and hanged himself in the shower. (Dkt. No. 1 at ¶ 23.) In his Complaint, Plaintiff alleged that Healy and two other corrections officers entered Plaintiff's cell and cut him down and then began beating him with their hands and feet. *Id.* Plaintiff begged them to stop. *Id.* Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. *Id.* Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24.

## C. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

**\*10** On August 29, 2010, while eating breakfast, one of Plaintiffs teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff claims that he thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Defendant Miller, a dentist at Upstate, asking for help on September 6 and 14, 2010. [13] *Id.* at ¶ 29.

On October 5, 2010, Plaintiff submitted Grievance No. UST 44009–10, in which he complained that he had been in pain for over a month because of a lost filling and had written to the dental department several times but had not been called out. (Dkt. Nos. 46–1 at ¶ 74; 49–2 at 4.) In his Declaration, Dr. Miller has stated that he investigated the claim and determined that no dental call out slips had been received from Plaintiff during that time period, as Plaintiff has claimed (*see* Dkt. No. 1 at ¶ 49), but made no mention of Plaintiff's September 6 and 14, 2010, letters. [14] (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.)

Prior to filing the grievance, Plaintiff had gone to a dental appointment on September 29, 2010. (Dkt. Nos. 1 at ¶ 50; 46–1 at ¶ 51; 49 at 3.) When he arrived for the appointment, he learned from the hygienist that he was there for a cleaning, not to treat his lost filling and cracked tooth. (Dkt. No. 1 at ¶ 50.) Plaintiff's dental records confirm his claim that he informed the dental hygienist of the lost filling at the September 29th appointment, and Miller acknowledges that Plaintiff's dental records reflect that he informed the hygienist about the lost filling, and states that Plaintiff was scheduled for a follow-up appointment on November 3, 2010, to address the lost filling concern. (Dkt. Nos. 46–1 at ¶¶ 51, 53–54; 49 at ¶¶ 10–13; 49–1 at 3.) The hygienist's note did not indicate that Plaintiff complained of pain from the lost filling, and Dr. Miller has opined that a lost filling without significant pain is not emergent and does not require immediate dental treatment. (Dkt. Nos. 46–1 at ¶¶ 78–79; 49 at ¶¶ 22–23.)

On November 3, 2010, Dyer and Corrections Officer Burgess escorted Plaintiff from his cell for an Alcohol and Substance Abuse Treatment Program ("ASAT") evaluation and a dental call-out. (Dkt. Nos. 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 6–7.) The ASAT evaluation was to be conducted in the room next to the block dental office. *Id.* Plaintiff claims that he told Dyer he wanted to refuse the ASAT call out because he was really

in pain and couldn't eat or sleep and really needed to see the dentist. (Dkt. No. 1 at ¶ 55.) Dyer is alleged to have told Plaintiff that he made the rules, and the rules were that if Plaintiff refused one call out, he refused both. (Dkt. No. 1 at ¶ 56.) Dyer denies that Plaintiff ever told him he was in pain or that he wanted to skip the ASAT evaluation in order to see the dentist sooner. (Dkt. Nos. 46–1 at ¶ 57; 51–2 at ¶ 8.)

**\*11** Plaintiff was placed in a holding pen, and while he was waiting to see the dentist, Dyer escorted him to the ASAT evaluation. (Dkt. Nos. 46–1 at ¶¶ 58–59; 51–2 at ¶ 10.) After the ASAT evaluation, Plaintiff was returned to the holding pen to wait for the dentist. (Dkt. Nos. 46–1 at ¶ 60; 51–2 at ¶ 11.) According to Dyer, while Plaintiff was waiting in the holding pen, he began yelling at the dental escort that he was going to be seen next by the dentist. (Dkt. Nos. 46–1 at ¶ 61; 51–2 at ¶ 12.) Plaintiff claims that when a corrections officer tried to take Plaintiff to see the dentist, Dyer waived him away and told Plaintiff if he made it into the dentist at all he would be last, and he might not get in there at all. (Dkt. No. 1 at ¶ 57.) Dyer contends that he did not threaten Plaintiff in any way, and the only thing he said to him was "Jones, stop causing a disturbance," when Plaintiff was yelling at the dental escort. (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

According to Dyer, Santamore spoke to the dentist, who said he had priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff was told to quiet down or he would be returned to his cell, and when he continued to yell and create a disturbance, Santamore ordered Plaintiff returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer claims he had no interest or intent in interfering with Plaintiff's dental care and was only complying with Santamore's order in taking Plaintiff back to his cell. (Dkt. Nos. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.) Dyer does not address Plaintiff's execution of a Refusal of Medical Examination And/Or Treatment with regard to the dental work he was supposed to have done on November 3, 2010, or the notation by Plaintiff "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but corrections staff refuse to let me see dental staff." (Dkt. Nos. 46–1 at ¶ 70; 49–1 at 6.) Plaintiff claims that it was dismissed Defendant Burgess who demanded Plaintiff sign the dental form and go back to his cell or he would be seeing more than the dentist with a visit to the facility hospital. (Dkt. No. 1 at ¶ 59.) According to Dr. Miller, he did not see Plaintiff on November 3, 2010, and was not involved in obtaining the refusal signed by Plaintiff. (Dkt. Nos. 46–1 at ¶ 72; 49 at ¶ 16.)

Plaintiff's tooth was not fixed before he left Upstate, but according to Plaintiff, he was seen by dental approximately a week after being transferred to Clinton and received a temporary filling. (Dkt. No. 1 at ¶ 63.)

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies with Regard to Claims Against Defendants Healy, Marinelli, and Kemp

Defendants Healy, Marinelli, and Kemp seek summary judgment dismissing Plaintiffs' Eighth Amendment claims against them on the ground that Plaintiff failed to exhaust his administrative remedies. (Dkt. Nos. 46–2 at 4–7; 46–4 at ¶¶ 11–12.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996). imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

#### 1. DOCCS Internal Grievance Program

**\*12** In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP"). See N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, Part 701 (2013); (Dkt. Nos. 46–1 at ¶¶ 82–84; 46–4 at ¶¶ 4–6.) The first step requires an inmate to file a grievance complaint with the facility's IGP clerk within twenty-one days. Id. at § 701.5(a). If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing. Id. at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, id. at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision.

*Id.* at 701.5(c)(1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c) (3)(i). The third step is an appeal to CORC, *id.* at 701.5(d) (1)(i), which issues a written decision. *Id.* at 701.5(d)(3) (ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford, 548 U.S. at 93.* Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier,* No. 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14–15 (N.D.N.Y. Oct.4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust. "Once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff.

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases).

**\*13** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [15] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

### 2. *Exhaustion as to Healy*

Plaintiff's allegations with respect to his Eighth Amendment deliberate indifference and excessive force claims against Healy are set forth in paragraphs 23 and 24 of his Complaint. (Dkt. No. 1 at ¶¶ 23–24.) Plaintiff has alleged in his Complaint that he "used the prisoner grievance procedure available at Upstate on 1/13/10 to exhaust all remedies all remedies were exhausted on 10/14/10 for issues in paragraph # 23 and # 24." (Dkt. No. 1 at ¶ 66.) The dates provided by Plaintiff make no sense given that Plaintiffs claims against Healy arise out of an incident that allegedly occurred on October 21, 2010. *Id.* at ¶¶ 23–24. Furthermore, as discussed below, the documentary evidence in the summary judgment record establishes that Plaintiff never appealed a grievance arising out of that incident to CORC. (Dkt. Nos. 46–1 at ¶ 88; 46–4 at ¶ 12 and 4.)

Jeffrey Hale ("Hale"), Assistant Director of the IGP, is the custodian of records maintained by CORC, which renders the final administrative decisions under the DOCCS IGP. (Dkt. No. 46–4 at ¶ 2.) According to Hale, the issues alleged in Plaintiffs Complaint are proper subjects for grievances under the DOCCS IGP. (Dkt. Nos. 46–1 at ¶ 86; 46–4 at ¶¶ 8–9.) DOCCS Directive # 4040 stipulates that when an inmate appeals a grievance to CORC, it is DOCCS' policy to maintain grievance files for the current year and four prior years. (Dkt. Nos. 46–1 at ¶ 85; 46–4 at ¶ 7.) CORC maintains records in accordance with that policy and, in fact, the CORC computer database contains records of all appeals of grievances received from the IGP Supervisor, as well as those reviewed under the expedited procedure at § 701.8, since 1990. *Id.* Hale conducted a diligent search for appeals filed by Plaintiff based on grievances filed at the facility level and has submitted true and correct copies

of records maintained by CORC which show that Plaintiff did not appeal any grievance filed under §§ 701.5 or 701.8 claiming he was denied adequate mental health treatment or subjected to excessive force by Healy while he was confined at Upstate. [16] (Dkt. Nos. 46 at ¶ 87; 46–4 at ¶ 11 and 4.) Inasmuch as Plaintiff has failed to complete all of the steps of the DOCCS IGP with regard to his Eighth Amendment claim against Healy for deliberate indifference to his serious mental health needs and excessive force, he has failed to exhaust his administrative remedies. *See Woodford,* 548 U.S. at 90 (PLRA requires a plaintiff to complete all of the steps of the applicable IGP and to do so properly to exhaust administrative remedies).

**\*14** Plaintiff fairs no better under the three-part *Hemphill* inquiry. As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U .S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec.13, 2011). That the grievance procedure was made available to, and actually used by, Plaintiff during his incarceration, is clear from his history of grievances revealed by Hale, and the grievance Plaintiff filed regarding his lost filling. (Dkt. Nos. 46–1 at ¶¶ 74, 82–85; 46–4 at 6–77; 49–2 at 4.)

Furthermore, there is no evidence in the record that Healy interfered in any way with efforts by Plaintiff to file a grievance against him under the IGP and, therefore, no basis for an estoppel. Third, the record is devoid of evidence of "special circumstances" excusing Plaintiff's failure to exhaust. To the contrary, Plaintiff has alleged in conclusory fashion in his Complaint that he did exhaust. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (conclusory assertions are not enough to avoid summary judgment when the movant has set out a documentary case).

Therefore, the Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims against Defendant Healy and recommends that Healy be granted summary judgment on that ground.

### 3. *Exhaustion as to Marinelli and Kemp*

In his Complaint, Plaintiff has alleged that he filed complaints regarding his claims against Marinelli and Kemp with the OMH all the way up the chain to the OMH Commissioner. (Dkt. No. 1 at ¶ 65.) Although Plaintiff alleged that he also filed a grievance with Upstate, presumably under the IGP, and appealed the results to be sure exhaustion was complete, Hale's search of CORC records revealed no appeal by Plaintiff of a grievance complaining of his mental health treatment by Marinelli and Kemp. (Dkt. No. 1 at ¶ 65; 46–1 at ¶ 87; 46–4 at ¶ 11 and 4.) Therefore, the Court finds that Plaintiff did not exhaust his claims against Marinelli and Kemp under the IGP. *See Woodford,* 548 U.S. at 90.

That, however, does not end the Court's inquiry on the exhaustion because issues remain as to whether administrative remedies were in fact available to Plaintiff under the IGP with respect to his claims against Marinelli and Kemp [17] and whether there were special circumstances excusing exhaustion. *See Hemphill,* 380 F.3d at 686.

Plaintiff was questioned at his deposition [18] as to whether he filed a grievance against Marinelli:

Q. Did you file any grievances against Mr. Marienelli (sic)?

A. I think I did, yes.

Q. Okay.

A. I'm pretty sure I did. Or—because also, when you're dealing with M.H.U., you can't really grieve them. You have to write a complaint through—

Q. To the medical—.

A. —to the mental health department.

Q. Right. Right. So the mental health issues go to mental health and the medical issues go to the medical director.

**\*15** A. Go to medical, right.

Q. Yes, okay.

A. So even though you could write it, but its not going to get anywhere. So you have to they tell you

Q. That's why you wrote to Kemp?

A. Kemp, exactly.

Q. Yup. Okay.

A. That's the whole reason why, because you know, even they they're not even allowed to discuss

your mental health file with the grievance people because of confidentiality. So that's kind of like a catch twenty-two.

Q. So you complained to Kemp because, as you understood it, that's the proper process?

A. Right.

(Dkt. No. 46–3 at 35–36.)

In determining whether administrative remedies are available to a particular inmate, a court should "be careful to look at the applicable set of grievance procedures, whether city, state, or federal." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (citation and internal quotation marks omitted). Administrative remedies are not available "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth v. Churner,* 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

Hale has described Plaintiff's Eighth Amendment claims against Marinelli and Kemp as the "proper subject for DOCCS grievance procedures as outlined under 7 NYCRR § 701.1 et seq." (Dkt. No. 46–4 at ¶ 9.) However, both Marinelli and Kemp are OMH, not DOCCS employees, and § 701.3(f) provides:

(f) Outside agencies excluded.

Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP.

7 NYCRR, § 701.3(f).

Grievances involving actions taken by OMH have in at least some instances been determined by DOCCS to be outside the jurisdiction of the DOCCS IGP based upon § 701.3(f). *See, e.g., Westmoreland v. Conway,* No. 07–CV–104(Sr.), 2009 WL 2991817, at *3–4, 2009 U.S. Dist. LEXIS 83993, at * 9–10 (W.D.N.Y. Sept.15, 2009) (plaintiff's allegation that his grievance was dismissed because the IGRC lacked authority over the OMH found to comport with 7 NYCRR § 701.3(f)); *Christian v. Goord,* No. 9:03–CV–901 (FJS/GJD), 2006 WL 1459805, at * 5, 2006 U.S. Dist. LEXIS 32143 (N.D.N.Y. May 22, 2006) (both the IGRC and Superintendent on appeal concluding that the OMH is outside the purview of DOCCS and the IGP).

Given the foregoing, the Court cannot conclude that administrative remedies under the IGP were available to Plaintiff with regard to his claims against OMH employees Marinelli and Kemp, or that Plaintiff's understanding that the IGP did not apply to OMH employees did not constitute a special circumstance excusing failure to exhaust, and recommends that Marinelli and Kemp be denied summary judgment on exhaustion grounds.

## B. Merits of Plaintiff's Eighth Amendment Claim Against Marinelli and Kemp

**\*16** Defendants Marinelli and Kemp also seek summary judgment on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The requirement extends to adequate mental health care. *See Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [429 U.S. 97, 104 (1976) ], that it must be provided to prisoners."); *Guarneri v. Hazzard,* No. 9:06–CV–985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar.22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

To state a claim for denial of medical or mental health care, a prisoner must demonstrate (1) a serious medical (mental) condition, and (2) deliberate indifference. *Farmer,* 511 U.S. at 834–35; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ( "*Hathaway I* " ). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. *See Caiozzo v. Foreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). A "serious medical condition" has been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited

to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

The second prong is a subjective standard. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)) ("*Hathaway II*"). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ( "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")

**\*17** The record evidence does not support Plaintiffs claim that he suffered from a serious mental illness during his time at Upstate. [19] Furthermore, even though Plaintiff was deemed to have some degree of mental illness during at least a part of his time at Upstate, given the evidence of the mental health treatment Plaintiff received from OMH during his time there, no reasonable jury could find that either Marinelli or Kemp had been deliberately indifferent to Plaintiff's mental health issues and treatment needs. [20] *See Selevan v. N.Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir.2013) (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Plaintiff arrived at Upstate with a diagnosis of ASPD, a prescription for Topamax, a Mental Health Level of 3, and a Transfer Progress note from Great Meadow stating his mental status was alert and oriented, with no evidence of a thought disorder, and a generally neutral and stable mood. (Dkt. Nos. 46–1 at ¶¶ 2–11; 47–1 at ¶¶ 5–16.) When Plaintiff was seen by Marinelli for a mental heath assessment less than a week after his arrival at Upstate in September of 2009, Marinelli observed no mental health concerns or issues. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 12.)

Marinelli nonetheless placed Plaintiff on "active status" so he would continue to received OMH services and continued to see Plaintiff either cell-side or for a private therapy session on a regular basis until he was terminated from service on March 30, 2010, with Kemp's approval, after Plaintiff had denied the need for services and his Mental Health Level had been upgraded to a Level 6. (Dkt. Nos. 46–1 at ¶¶ 13–17, 19–36; 47–1 at 1; 48 at ¶¶ 30–33.) During that time, Plaintiff generally reported no mental health issues or concerns, and Marinelli reported that he observed no evidence of mental health issues. *Id.* Marinelli's notes are largely in accord with Dr. Wurzberger's positive assessment of Plaintiff's mental status on October 9, 2009, when he, not Marinelli or Kemp as Plaintiff claims, took Plaintiff off Topamax. (Dkt. Nos. 46–1 at ¶¶ 18–19, 43–44.)

Even after Plaintiff's OMH services were terminated, Marinelli continued to do SHU 90–day mental health evaluations, which confirmed that Plaintiff's Mental Health Level remained at Level 6 from March 30, 2010, until his transfer to Clinton on November 15, 2010. (Dkt. No. 46–1 at ¶¶ 38–40; 47–1 at 1; 48 at ¶¶ 34–35, 37.)

While Plaintiff claims that Marinelli responded to his attempt at suicide by cutting his arms with a piece of metal by telling him it did not look too bad and to run water on the cuts (Dkt. No. 1 at ¶ 22), Marinelli denies the incident ever occurred, and there is no evidence of such an incident in Plaintiff's mental health records. (Dkt. Nos. 46–1 at ¶ 36; 48–1 at 1–118.) Even assuming, *arguendo,* that the incident did occur, Plaintiff has failed to present evidence that the cuts he inflicted were severe enough to cause serious injury or constitute what could reasonably have been construed by Marinelli as a serious attempt at suicide, and that Marinelli showed deliberate indifference.

*18 In light of the foregoing, the Court recommends that Defendants Marinelli and Kemp be granted summary judgment on the merits on Plaintiffs Eighth Amendment medical indifference claim.

## C. Eighth Amendment Claim Against Dyer

Plaintiff claims that Defendant Dyer, a corrections officer, showed deliberate indifference to his serious dental needs by preventing him from seeing the dentist for his lost filling on November 3, 2010. (Dkt. No. 1 at ¶¶ 55–58.) Although medical deliberate indifference claims are most-often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs, in this case dental needs, when a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin,* No. 92 Civ. 0622(LAP), 1994 WL 519902, at * 11, 1994 U.S. Dist. LEXIS 13409, at * 31 (S.D.N.Y. Sept.22, 1994) (citations and internal quotation marks omitted), *aff'd,* 52 F.3d 310 (2d Cir.1995) (table); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (same).

The record evidence shows that on November 3, 2010, Dyer was tasked with escorting Plaintiff to an ASAT evaluation and an appointment with the dentist to have his lost filling addressed. (Dkt. Nos. 1 at ¶ 55; 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 22–23.) Dyer took Plaintiff to his ASAT evaluation while Plaintiff was waiting to see the dentist, and after the evaluation returned Plaintiff to the holding pen to wait to see the dentist. (Dkt. No. 46–1 at ¶¶ 58–60; 51–2 at ¶¶ 10–11.) There is no evidence in the record indicating that Plaintiff would have seen the dentist any sooner had he not gone to the ASAT evaluation.

According to Dyer, while waiting to see the dentist, Plaintiff created a disturbance by yelling at the dental escort that he was going to be seen next by the dentist and was told to quiet down or he would be returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 61–63; 51–2 at ¶¶ 12, 16.) At his deposition, Plaintiff admitted that he had started complaining and had called out to the dentist that he needed to see him. (Dkt. No. 46–3 at 53.) Dyer told Plaintiff to "stop causing a disturbance." (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

Corrections Sergeant Santamore spoke to the dentist and was told there were priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff continued to yell and create a disturbance, and Santamore ordered Dyer to take Plaintiff back to his cell. (Dkt. No. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer followed the order and returned Plaintiff to his cell. (Dkt. No. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.)

Even if Dyer was aware that Plaintiff was "really in pain," as Plaintiff has alleged and Dyer has denied (Dkt. Nos. 1 at ¶ 55; 46–1 at 46–1 at ¶ 57; 51–2 at ¶ 8), there is no evidence in the record supporting Plaintiff's claim that Dyer intentionally delayed his access to dental care, or that Dyer was responsible for Plaintiff missing his dental appointment on November 3, 2010. Therefore, the Court recommends that Dyer be granted summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious dental needs.

## D. Eighth Amendment Claim Against Miller

*19 Plaintiff claims that Dr. Miller was deliberately indifferent to his serious dental needs in violation of the Eighth Amendment by his failing to attend to a lost filling in a timely manner. (Dkt. Nos. 1 at ¶¶ 49, 76.) Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference from Miller. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance,* 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain .' " *Chance,* 143 F.3d at 702 (citing *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Specifically, "[a] cognizable claim regarding inadequate dental care ... can be based on various factors, such as the pain suffered by the plaintiff ... the deterioration of the teeth due to a lack of treatment ... or the inability to engage in normal activities." *Chance,* 143 F.3d at 703 (citations omitted); *see also Berry v. Wright,* No. 04–CV–0074(Sr.), 2011 WL 231626, at *5, 2011 U.S. Dist LEXIS 6347, at * 12–13 (W.D.N.Y. Jan.24, 2011) ("[a]lthough delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation, ... a prisoner can state a claim of deliberate medical indifference under section 1983 if 'the delay was deliberate and that it caused him to suffer unnecessary and wanton infliction of pain.' ") (quoting *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989)).

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay ... in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's

underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Washington v. Farooki,* No. 9:11–CV–1137 (TJM), 2013 WL 3328240, at *6, 2013 U.S. Dist. LEXIS 92623, at *16 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* No. 11–CV–586 (SJF)(ETB), 2012 WL 2921180, at *3, 2012 U.S. Dist. LEXIS (E.D.N.Y. July 11, 2012)).

Dr. Miller has opined that "the loss of a filling without significant pain is not an emergent situation and does not require immediate dental treatment." (Dkt. Nos. 46–1 at ¶ 79; 49 at ¶ 23.) In this case, however, Plaintiff claims that the lost filling caused him a great deal of pain, left him unable to eat out of one side of his mouth, and prevented him from sleeping. (Dkt. Nos. 1 at ¶ 48; 27–1 at 31–32; 49–2 at 4.) There is no evidence to the contrary in the summary judgment record. Plaintiff lost the filling on August 29, 2010, was not scheduled to have the lost filling addressed by the dentist until November 3, 2010, more than two months later, and ultimately did not have the lost filling taken care of until shortly after he was transferred to Clinton on November 15, 2010. (Dkt. Nos. 1 at ¶¶ 48, 63; 46–1 at ¶¶ 54, 72.) Even assuming without deciding that the great pain and problems with eating and sleeping Plaintiff claims resulted from the lost filling, when considered with the delay in treatment, constituted a serious dental condition, Dr. Miller is entitled to summary judgment because the record evidence does not show deliberate indifference on his part. *See Hunt,* 865 F.2d at 200 (deliberate indifference where the delay was deliberate and caused plaintiff to suffer unnecessary and wanton infliction of pain).

**\*20** The note in Plaintiff's dental records from his September 29, 2010, cleaning, which Miller acknowledged seeing noted only that Plaintiff had complained of a lost filling and said nothing about being in pain as a result. (Dkt. Nos. 46–1 at ¶ 51; 49–1 at 3.) Because in Miller's opinion, absent a report of significant pain, the lost filling was not emergent (Dkt. Nos. 46–1 at 79; 49 at ¶ 23), failure to schedule an appointment to fix the tooth until November 3, 2010, does not show culpable recklessness on his part. *See Hathaway II,* 99 F.3d at 553.

While Plaintiff claims to have submitted a number of sick call slips to the Dental Department requesting assistance, Miller investigated Plaintiff's chart in response to an October 5, 2010, grievance filed by Plaintiff and determined that no call-out slips from Plaintiff had been received by the Dental Department during the relevant time period. (Dkt. Nos. 46–1

at ¶ 75; 49 at ¶ 19.) Moreover, while Plaintiff also claims to have sent letters of September 6 and September 14, 2010, to Miller advising him of his great pain and requesting assistance regarding the lost filling (Dkt. Nos. 1 at ¶¶ 49; 27–1 at 31–32), Dr. Miller has stated in his Declaration that he was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that he ignored. (Dkt. Nos. 46–1 at ¶ 80; 49 at ¶ 24.) There is no evidence in the record refuting that statement, no evidence that Dr. Miller ever saw the dental slips Plaintiff claims to have submitted or the letters Plaintiff claims to have sent to him. Given Plaintiff's failure to respond to Defendants' L.R. 7.1 Statement of Material Facts, he is deemed to have admitted that Miller's investigation revealed no call-out slips regarding Plaintiff's lost filling, and Miller was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that was ignored. (Dkt. Nos. 46–1 at ¶¶ 75, 80; 49 at ¶¶ 19, 24.)

Finally, the evidence shows that an appointment was scheduled for November 3, 2010, for Plaintiff's lost filling to be addressed, and Miller had no part in Plaintiff being returned to his cell before seeing him, or in the execution of the Refusal of Medical Examination and/or Treatment form. (Dkt. Nos. 46–1 at ¶¶ 67, 72; 49 at ¶ 16; 51–2 at ¶ 17.) Plaintiff was transferred to Clinton shortly thereafter where his tooth was fixed. (Dkt. No. 46–1 at ¶ 73; 49 at ¶ 17.)

In light of the foregoing, the Court recommends that Miller be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

### E. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. (Dkt. No. 46–2 at 15–18.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

### F. John Doe Defendants # 1–6

**\*21** Plaintiff has asserted claims against John Doe Defendants # 1–6 in this action. There is nothing in the record showing that any of the John Doe Defendants have been identified and served in this lawsuit which was commenced nearly three years ago. (Dkt. No. 1.) The discovery completion deadline in the case was January 18, 2014, more than a year ago. (Dkt. No. 32.) The Court finds that Plaintiff has had ample time and opportunity to discover

the identity of the John Doe Defendants and serve them. Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of John Doe # 1–6 from the action for failure to prosecute. *See Delrosario v. City of N.Y.*, No. 07 Civ.2027(RJS), 2010 WL 882990, at * 5, 2010 U.S. Dist. LEXIS 20923, at * 12 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants ."); *Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y.2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED IN ITS ENTIRETY;** and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe Defendants # 1–6 be **DISMISSED WITHOUT PREJUDICE** from this action due to Plaintiff's failure to prosecute; and it is hereby

**ORDERED,** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision *m Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: January 30, 2015.

**All Citations**

Slip Copy, 2015 WL 791547

Footnotes

1    Although with the exception of the claims dismissed on Eleventh Amendment grounds, Plaintiff was granted leave to amend, no amended complaint has been filed.

2    References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

3    Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2008) (per curiam).

4    N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

5    Plaintiff's Complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 17–18.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

6    *See also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030–31 (9th Cir.2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

7    The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties ." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 647 (2d Cir.2005) (citation and internal punctuation and quotation marks omitted).

L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific citation to the record where the fact is established .... The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment .... The opposing party shall file a response to the Statement of Material Facts .... *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*

8    See *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

9    Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 46.)

10   Where a fact has been included in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1), docket references are made herein to both the Statement and the record evidence cited in support of the fact.

11   According to Marinelli, PIMS stands for "Progressive Inmate Movement System," established for the standardization of a system of progressive advancements for SHU inmates based upon behavioral adjustment. (Dkt. No. 48 at ¶ 20 n. 3.)

12   Defendant Healy seeks summary judgment solely on failure to exhaust grounds and has submitted no factual evidence with regard to Plaintiff's Eighth Amendment claim against him. (*see* Dkt. No. 46–1 at ¶¶ 82–86, 88.) The background facts included herein are from Plaintiff's verified Complaint.

13   Copies of the letters, which were identified as exhibits in the Complaint were submitted by Plaintiff in opposition to Defendants' earlier motion to dismiss and are considered herein as a part of Plaintiff s Complaint. (Dkt. Nos. 1 at ¶ 49; 27–1 at 31–32.)

14   In its denial of Plaintiff's grievance, the Internal Grievance Resolution Committee wrote "Grievant should write to the Dental Dept. and address his concerns and to be scheduled. writing to the IGRC isn't the proper procedure to obtain an appt." (Dkt. No. 49–2 at 3.) The Committee appears to have made no reference to the September 6 and 14, 2010, letters Plaintiff claims to have sent to Miller. *Id.;* Dkt No. 27–1 at 31–32.

15   Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

16   Defendants have submitted the grievance files on the grievances listed as having been appealed to CORC by Plaintiff (Dkt. No. 46–4 at 4) so that the Court has been able to ascertain that none of them involved Plaintiff's claims against Healy. *Id.* at 8–77.

17   As noted above, Defendants have the burden of showing that the administrative remedy was actually "available" to Plaintiff. *See Murray,* 2010 WL 1235591, at *4.

18   Defendants submitted Plaintiff's deposition transcript in support of their summary judgment motion. (Dkt. No. 46–3.)

19   Plaintiff's letters to Kemp and Hogan regarding his mental health problems and alleged lack of proper care, with the exception of his complaints about Marinelli's reaction to his alleged suicide attempt discussed below, were far too general and conclusory to create an issue of material fact as to the seriousness of his mental health issues in light of the mental health records submitted by Defendants. (Dkt. No. 27–1 at 5–13.)

20   A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correc. Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207 (2d Cir.1986).

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 882990
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jairo DELROSARIO, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
|
March 4, 2010.

West KeySummary

1 **Civil Rights**

 👉 Criminal Law Enforcement; Prisons

Neither official in charge of prisoner movement nor official in charge of security had authority to make final policy decisions for the city with respect to the protection or housing of prisoners at penal institution, as required to hold the city liable under § 1983 for officials' alleged unconstitutional acts. Inmate alleged that officials deliberately ignored a known risk to his safety from fellow prisoners, who repeatedly threatened and assaulted inmate for cooperating with authorities, but the only reference to them was prosecutor's identification of their respective roles at institution. No information was given with respect to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Robert B. Marcus, Schwartzapfel, Truhowsky, Marcus, P.C., Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel of the City of New York, New York, N.Y., for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Jario Delrosario brings this action against the City of New York ("the City"), Manhattan Assistant District Attorney Susan Lanzatella, and ten John Doe Defendants pursuant to 42 U.S.C. § 1983 for alleged deprivations of his civil rights. Now before the Court is Defendants' motion to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants move for summary judgment pursuant to Rule 56(a). For the reasons set forth below, Defendants' motion for summary judgment is granted.

I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other inmates while he was incarcerated at Riker's Island Correctional Facility ("Riker's"), located in Bronx County, New York and part of the New York City Department of Corrections ("DOC"). Plaintiff alleges that, although he was repeatedly threatened and assaulted by other inmates for acting as a cooperating witness, Defendants failed to take steps necessary to protect him from further violence. In addition, Plaintiff alleges that Riker's personnel denied him medical care after he was assaulted.

A. Facts

1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged with various crimes under New York state law arising out of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he was arrested, Plaintiff was taken to and detained at Riker's. (*Id.* ¶ 4.) Defendant Lanzatella, an assistant district attorney and chief of the Narcotics Gang Unit of the New York City Special Narcotics Prosecutor's Office ("SNPO"), was assigned to prosecute Delrosario and his co-defendants. (*Id.* ¶ 7.) Lanzatella was assisted by the only attorney under her supervision at that time, Nigel Farinha. (Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [1]

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed them. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

**\*2** After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:l–5.) [3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken

jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [4] The letter bears the date of March 3, 2006 and states:

> I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.

> > Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooperation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further, he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited

and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

### 2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however, she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

### B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint

("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17,2009.

**\*4** The Amended Complaint purports to contain a single claim under Section 1983. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

**B. Claims Against John Doe Defendants**

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss these Defendants without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

**C. Municipal Liability for the Acts of Prison Officials**

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC

¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

**1. Applicable Law**

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ. 481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*12 (S.D.RY. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may be demonstrated through behavior that is " 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127–28 & 127 n. 8. Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell.*" *Batista,* 702 F.3d at 397.

### 2. Analysis

#### a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Fariñha's March 3, 2006 letter request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837–38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the decisions of final policymakers, "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making official" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of inmates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had

final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at \*7 (S.D.N.Y. Feb.1, 2008).

#### b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread constitutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, however, is admissible evidence. [5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time on or after March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking employees, is insufficient to

support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

### c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N. Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amensty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to

protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

### D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur* ) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

Section 177–c of the New York Judiciary Law provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New

York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farinha. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy with respect to the handling of cooperating witnesses or ensuring inmate safety. *See Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker), Plaintiff has adduced no evidence or legal authority indicating otherwise.

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

#### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute immunity attaches to particular conduct, courts apply a functional approach. *See Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N.Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

**\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for

its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5–13.) Although Lanzatella testified that her interviews of Plaintiff were intended "to obtain information about the defendants he was arrested with and their criminal activities

*and others,"* (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.* 73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan,* 996 F.2d at 530, her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at \*5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence

if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, \*2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor

was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established.*" (omissions and internal citations omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at \*1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at \*4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzataella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

## III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety, The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 882990

Footnotes

1    Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

2    Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

3    Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

4    The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasatoro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

5    It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

**End of Document**                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.
    I. *Introduction* [FN2]
        FN2. This matter was referred to the undersigned
        for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

    *1 Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

    II. *Procedural History*

    On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

    III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

    On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct.' " *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978).* However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 2628720
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Johnathan JOHNSON, Plaintiff,

v.

B. CONNOLLY, Doctor et al., Defendants.

Civil Action No. 9:07–CV–1237 (TJM/DEP).

|

March 15, 2010.

**Attorneys and Law Firms**

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, The Capitol, Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Johnathan Johnson, a New York prison inmate and a prodigious litigant, has commenced this suit pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[1] In his complaint, plaintiff asserts that prison officials at the Upstate Correctional Facility ("Upstate") were deliberately indifferent to his medical needs following his transfer into that facility, including by not providing him with medication previously prescribed for him at other prison facilities, and that his transfer into Upstate was in retaliation for his having engaged in protected activity. Plaintiff's complaint seeks both equitable relief, in the form of an unspecified permanent injunction, and recovery of compensatory and punitive damages.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint in its entirety. In their motion, defendants assert that the record does not support either of plaintiff's substantive claims and that they are, therefore, entitled to judgment dismissing those claims as a matter of law. Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments in response, I recommend that the motion be granted with respect to all claims except plaintiff's retaliation cause of action against defendant Burge, as to which genuine issues of fact exist precluding summary judgment.

I. *BACKGROUND*[2]

The plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Amended Complaint (Dkt. No. 7). At the times relevant to his claims in this action plaintiff was designated first to the Elmira Correctional Facility, located in Elmira, New York, and later following his transfer out of that prison on November 16, 2006, to Upstate, situated in Malone, New York.[3] It appears that at all relevant times plaintiff was designated to special housing unit ("SHU") disciplinary confinement.[4] *Id.*

While confined at Elmira, on November 13, 2006 plaintiff apparently was the target of human feces thrown by another inmate in the SHU during plaintiff's scheduled shower period. Complaint (Dkt. No. 7) p. 5–B. That incident prompted the sending by plaintiff of a letter to defendant John Burge, the Superintendent at Elmira, requesting that the videotape footage of the incident be preserved for use in a future lawsuit.[5] *Id.*

Two days later, on November 15, 2006, the DOCS Classification and Movement Office, which as a general matter controls inmate facility assignments, received an electronic request that Johnston be transferred out of Elmira. Carvill Aff. (Dkt. No. 68–4) ¶¶ 4, 6, 11 and Exh. A; *see also* Burge Aff. (Dkt. No. 68–3) ¶¶ 9–10. The stated reason for the transfer request was that plaintiff had a "severe problem at Elmira CF SHU." Carvill Aff. (Dkt. No. 68–4) ¶ 12 and Exh. A. As an explanation for that observation, the statement noted that plaintiff "ha[d] created a management problem in the SHU ... he is disruptive to other [inmates] in the unit ..." and made reference to the November 13, 2006 incident. *Id.* at ¶ 14 and Exh. A. The transfer request was processed by John Carvill, a Classification Analyst with the DOCS. Carvill Aff. (Dkt. No. 68–4) ¶¶ 1, 6, 11 and Exh. A. On recommendation of the SHU unit of the Classification and Movement Office, it was determined by defendant Carvill that the plaintiff should be transferred into Upstate. *Id.* at ¶¶ 9–14. When making that decision Carvill was unaware of plaintiff's contemplation of

a lawsuit concerning the feces throwing incident at Elmira on November 13, 2006. *Id.* at ¶ 16.

**\*2** According to the plaintiff, Superintendent Burge, though not present for the throwing incident, spoke with the plaintiff about the transfer on November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated "I'm getting rid of you." Amended Complaint (Dkt. No. 7) p. 5–C; Johnson Dep. Tr. pp. 82–86; Johnson Aff. (Dkt. No. 69) ¶ 12. Other than that statement, during his deposition plaintiff admitted that he has no evidence to support his allegation that Superintendent Burge initiated the transfer request or was otherwise a participant in the decision to place him in Upstate. *Id.* at pp. 89–90.

According to Superintendent Burge, the transfer of a prisoner is typically initiated by the inmate's guidance counselor, who sends a transfer request directly to the DOCS Classification and Movement Office in Albany. Burge Aff. (Dkt. No. 68–3) ¶ 9. Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request. *Id.* at ¶¶ 11–14. While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates. *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006. *See* Smith Aff. (Dkt. No. 68–2) ¶ 11 and Exh. B. According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterlogical disorder; and Vitamin E lotion for a dry, irritated skin condition. *Id.* at ¶¶ 15–16. As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications. [6] *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

Under established protocol, upon his transfer plaintiff's prescription medications should have been packed in a white medication bag and transferred to the medical staff at Upstate. Smith Aff. (Dkt. No. 68–2) ¶ 12. This, unfortunately, did not occur upon plaintiff's transfer. *Id.* at ¶ 13 and Exh. A at p. 3. Instead, plaintiff's medications were packed along with his personal property, and consequently those medications were not received by medical staff at Upstate until December 5, 2006. *Id.* at ¶ 13 and Exhs. A, B.

Plaintiff's medical records reveal that on November 20, 2006, four days after his transfer into Upstate, a physician at the facility ordered a seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff. Smith Aff. (Dkt. No. 68–2) ¶ 20 and Exh. B, 11/18/06 entry. Plaintiff received those medications on November 21, 2006 and November 24, 2006. *Id.* at ¶ 21 and Exh. C. In the interim, over-the-counter medications were made available to the plaintiff, upon request, to substitute for any lacking prescription medications. *Id.* at ¶ 22. Plaintiff's medical records reveal that, in fact, he did request such non-prescription medication on November 17, 18, and 26, 2006, including Medicidin D for nasal congestion and Ibuprofen for pain. *Id. at* ¶ 22 and Exh. B, 11/18/60 and 11/26/06 entries. The records also reflect that nasal spray was ordered for the plaintiff on December 5, 2006, at the request of a facility nurse, upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23–24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id. at* ¶¶ 27–28 and Exh. B, 11/18/06 and 11/26/06 entry.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court. [7] *See* Dkt. Nos. 1, 7. Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp–David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in violation of his rights under the First Amendment and also that the defendants at Upstate were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. *Id.*

Since commencement of the action plaintiff has twice sought preliminary injunctive relief, in both instances requesting that the defendants be directed to transfer him out of Upstate and into another facility for the safety of both Johnson and

his family. Dkt. Nos. 21, 41. Those motions were denied by Senior District Judge Thomas J. McAvoy by decisions issued on January 30, 2008 and August 21, 2008, respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the United States Court of Appeals for the Second Circuit. By summary order issued on October 16, 2009, and reissued as a mandate on November 12, 2009, that court affirmed Judge McAvoy's first preliminary injunction denial and ordered the issuance of a briefing schedule with regard to the second.[8] *See* Dkt. No. 70.

On April 27, 2009, following joinder of issue and the close of discovery, defendants filed a motion for summary judgment seeking dismissal of both of plaintiff's causes of action. Dkt. No. 68. In their motion defendants argue that no reasonable factfinder could conclude either that the plaintiff's transfer out of Elmira was provoked by his contemplation of a suit regarding the November 13, 2006 incident, or that once at Upstate the medical personnel there were deliberately indifferent to his serious medical needs. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 69, which is now fully briefed and ripe for determination and has been referred to me for the issuance of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement*

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

> **\*4** [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/ or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The nonmovant's response may also set

forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3). The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases) [9]; *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[10]

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The Travelers Indemnity Co. of Ill. v. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002)* (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

#### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Retaliatory Transfer Claim*

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13, 2006 incident. Defendants further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*6** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific,

are alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim. Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord,* 558 F.3d 119, 128–29 (2d Cir.2009); *Benitez v. Locastro,* No. 9:04–CV0423, 2010 WL 419999, at *13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into focus a controverted fact. At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation. *See Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation). In this instance, however, there is more. According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff. Amended Complaint (Dkt. No. 7) at pp. 5–7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined. *See id.* at 138–39.

**\*7** In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim. When construed in a light most favorable

to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants as having prompted the decision was pretextual. *See Gill v. Calescibetta,* No. 9:00–CV–1553, 2009 WL 890661, at * 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that defendants' motion for dismissal of plaintiff's retaliation claim be denied. [11]

### D. *Deliberate Medical Indifference Claim*

Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs. In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct.

2321, 2323–2324 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (*citing Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

### 1. *Serious Medical Need*

**\*8** In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

From the record in this case no reasonable factfinder could conclude that any of the conditions giving rise to the prescription medications of which plaintiff was deprived over an exceedingly brief period while at Upstate qualifies as serious for constitutional purposes. The medications involved were directed toward such modest conditions as lactose intolerance, nasal congestion, ankle pain, a gastrointestinal condition, and dry or irritated skin. The record is devoid of any indication that these conditions presented situations of urgency or resulted in degeneration or extreme pain over the brief period involved. Indeed, according to his medical records, plaintiff was seen by medical staff seven times over a four week period following his transfer into Upstate, including on November 16, 17, 18, 26, and 28, 2006 as well as December 5 and December 18 of that year. Smith Aff. (Dkt. No. 68–2) ¶ 33 and Exh. B. None of the medical record entries associated with those examinations reveal evidence that would support a finding of the existence of a serious medical condition. Accordingly, I recommend dismissal of plaintiff's medical indifference claim based upon his failure to establish the existence of a serious medical condition.

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F.Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

**\*9** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

The record now before the court also fails to substantiate plaintiff's claims of subjective, deliberate indifference on the part of the defendants The failure of prison officials to provide him with his prescription drugs immediately upon his arrival at Upstate appears to have been the result of a mistake on the part of DOCS medical personnel at Elmira, who are not named in this complaint, in packing and forwarding those prescriptions along with plaintiff's personal belongings rather than following the established protocol of separately conveying them to the medical staff at Upstate. The record also reveals that at Upstate plaintiff was offered alternatives to the medications and that his prescriptions for most drugs were renewed shortly after his transfer into the facility. Neither plaintiff's complaint nor the record now before the court establishes a level of indifference on the part of any of the named defendants sufficient to support the subjective element of the deliberate indifference test. Accordingly, I recommend dismissal of that cause of action on this additional, independent basis.

### E. *Personal Involvement*

In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp–David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that

individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question. Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer, LeClaire, Knapp–David and Bezio on this separate, independent ground.

### F. *Qualified Immunity*

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable

to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[14] *Pearson,* 555 U.S. at ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

 **\*11** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3)

whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d at 500 (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

In this instance the surviving claim of retaliation implicates legal principles that were firmly established in 2006, the time of the relevant events. Because there are disputed issues as to whether or not defendant Burge ordered a transfer of the plaintiff out of Elmira in retaliation for his protected activity, an action which could not be said to be objectively reasonable for a superintendent in his position, I recommend denial of defendants' motion for summary judgment based on qualified immunity, without prejudice.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action alleges two discreet causes of action. The first, alleging that plaintiff was transferred out of Elmira and into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

 **\*12** Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp–David, or Bezio were personally involved in the constitutional violations alleged,

and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action. Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by qualified immunity from plaintiff's retaliation claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp–David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2628720

Footnotes

1    In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment. *See* Amended Complaint (Dkt. No 7) § 4. Despite this statement, which was given under penalty of perjury, the record discloses otherwise. In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

2    In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

3    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

4    The record reflects that plaintiff has been in SHU confinement since 1997 and is currently scheduled to remain there until 2028, a date extending beyond his current maximum prison release date. *See* Hall Aff. (Dkt. No. 68–5) Exh. A. (Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter "Johnson Dep. Tr.") at pp. 20–21.

5    In response to his later requests for copies of the videotape, plaintiff was informed that due to a "recorder malfunction" it does not exist. *See* Johnson Aff. (Dkt. No. 69) Exh. A at p. 3.

6    As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles. Smith Aff. (Dkt. No. 68–2) ¶ 19.

7    This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

8    According to publically available information, that appeal remains pending, and was deemed ready as of the week of March 1, 2010. The pendency of that appeal, which addresses only plaintiff's request for interim injunctive relief, does not divest this court of jurisdiction to entertain and decide defendants' pending summary judgment motion. *Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996)

9    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [*Editor's Note: Attachments of Westlaw case copies deleted for online display.]

10   As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

11   As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp–David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement

in the alleged violation, *see* pp. 25–27, *post,* while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

**12**    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

**13**    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

**14**    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v.. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

---

**End of Document**                                                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    10


Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**

C

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing Officer Sgt. Noto, Defendants.

No. 06–CV–0456Sr.
Oct. 5, 2010.

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Gowanda Correctional Facility ("Gowanda") his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 18. For the following reasons, defendants' motion for summary judgment is granted and the plaintiff's complaint is dismissed in all respects.

### BACKGROUND

Plaintiff filed this action on July 11, 2006, against defendants, Michael Knowles and Louis Noto, pursuant to 42 U.S.C. § 1983, seeking monetary damages. *Id.* The action arises from a misbehavior report issued on or about July 27, 2003 by defendant Noto against plaintiff and the resulting Tier III disciplinary hearing conducted by defendant Knowles. *Id.* Specifically, the complaint alleges the issuance of a false misbehavior report, retaliation and violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff was an inmate in the care and custody of the New State Department of Correctional Services ("DOCS") housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1. Defendant Knowles was a Captain at Gowanda and his duties included, from time to time, conducting inmate disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp. 1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp. 1–2.

On July 22, 2003, at approximately 8:30 p.m., Correctional Officer Millich discovered several marijuana cigarettes during a search of inmate Meja's cell. Dkt. # 22, p. 3. Consequently, defendant Noto initiated an investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22, p. 3. Defendant Noto maintained that Meja told him that he had purchased the marijuana cigarettes from plaintiff. Dkt. # 22, p. 3. Based on Meja's identification of plaintiff and information allegedly received from confidential informant(s)—who identified plaintiff as a drug dealer and indicated that the sale in question occurred between 7:00 and 8:00 p.m. on July 22, 2003 in the prison yard—defendant Noto issued a misbehavior report charging plaintiff with violating Inmate Rule 113.25. Dkt. # 1, pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25 provides that "an inmate shall make, possess, sell or exchange any narcotic, narcotic paraphernalia, controlled substance or marijuana. An inmate shall not conspire with any person to introduce such items into the facility." Dkt. # 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On July 28, 2003, a Tier III disciplinary hearing was conducted before defendant Knowles. Dkt. # 1, p. 23; Dkt. # 21, p. 2. At the hearing, plaintiff testified in his own defense that he was at a Nation of Islam ("NOI")/Black studies program during the period of the alleged drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. # 21, p .6. Plaintiff called two other inmates, Ford and Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. *Id.* Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

## *DISCUSSION AND ANALYSIS*
### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the ap-

propriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell*[FN1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

> FN1. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Telli-er v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Con-ner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**

or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that plaintiff was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id* . Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him.[FN2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. #

21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

> [FN2.] Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession **and** sale of a narcotic. Dkt. # 21, pp. 5 and 19.

**Impartial Hearing Officer**

Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s), which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the

yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 FN3) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

FN3. 7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to pro-

tection under the federal constitution do not themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,*

239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth nonconclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation

Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**

with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8 SO ORDERED.**

W.D.N.Y.,2010.
Allred v. Knowles
Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.